IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NRC ENVIRONMENTAL SERVICES, INC., a Washington corporation, | No. 3:19-cv-01133-JR |
| Plaintiff, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| BARNARDS HOLDINGS, INC., fka WATER TRUCK SERVICE, INC., an Oregon corporation, and BOB JONAS, an individual domiciled in Oregon, | |
| Defendants. | |

RUSSO, Magistrate Judge:

Plaintiff NRC Environmental Services, Inc. ("NRC") initiated this breach of contract action

against defendants Barnards Holdings, Inc, formerly known as Water Truck Service, Inc. (which

was operated in conjunction with Stormwater Recycling, Inc.) (collectively "WTS") and Bob

Jonas. The Court conducted a bench trial from November 14 through November 17, 2022.

Page 1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

"In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The findings and conclusions may appear . . . in an opinion or a memorandum of decision filed by the court." *Id.* To that end, the Court directed both parties to file Proposed Findings of Fact and Conclusions of Law. Although portions of each parties' proposed findings and conclusions have been adopted, this Order reflects the Court's independent review of the record and the law.

The Court finds the following witnesses credible and has relied on their testimony: Robert Keesee, Robert Ransdell, Sarah Glathar, Anne Marie Skinner, and Serena Morones. The Court also finds that the following witnesses proffered testimony that was relevant and credible as to certain facts: Mr. Jonas and Christopher Rich.

## GENERAL BACKGROUND

*I. WTS Operations*

WTS held itself out as providing "environmental, infrastructure maintenance and infrastructure inspection services, including catch basin cleaning, vacuum and material handling, water transporting, sewer and pipe cleaning, and street and parking lot sweeping."

Mr. Jonas and his wife purchased property on Clutter Road – which contained a home, onion shed, large barn, and farm field – in an unincorporated part of Washington County, Oregon ("Clutter Facility"). Mr. Jonas subsequently added additional structures to that property.

In 1996, WTS began operating out of the Clutter Facility. The property served two business endeavors relevant to this dispute – i.e., wastewater pretreatment and street sweeping, which were conducted from a building and cement pad, respectively. Concerning the latter, WTS used the Clutter Facility as an interim amenity where it would unload the street sweepings and separate out the recyclable cans/bottles and garbage; the remaining content was reloaded into drop boxes for

transport to other locations (typically Dayton Ecology Composting, a composting facility owned by Mr. Jonas that held a "solid waste disposal site" permit with the Oregon Department of Environmental Quality ("ODEQ")). Street sweepings were transported away from the Clutter Facility within a couple of days. Depending on the time of year, the street sweepings then were either directly applied to composting or soil amendment, or further processed and screened in order to separate the inorganic material (e.g., sand, gravel, etc., otherwise known as "fines") from the organic material (e.g., leaves and larger debris), both of which were usually repurposed.

Mr. Jonas operated another facility located on Killingsworth Street in Multnomah County, Oregon ("Killingsworth Facility") in conjunction with the Clutter Facility's pretreatment activities. In particular, water vacuumed into WTS' trucks was taken to the Clutter Facility to undergo a physical separation process, where the solids were separated from the liquids by processing through a variety of equipment. The Clutter Facility is not connected to the sanitary sewer so the treated water was held in a tank until it was trucked to the Killingsworth Facility for discharge. The by-products of the separation process were taken to the Hillsboro Landfill for disposal. The only permit WTS held in association with these activities was from the Portland Bureau of Environmental Services ("BES").

*II. Underlying Business Transaction*

On January 6, 2017, the parties executed an Asset Purchase Agreement ("APA"), pursuant to which NRC purchased WTS' operations, along with all associated properties, assets, goodwill, and rights. NRC paid Mr. Jonas the full $3,500,000 purchase price, except for the $350,000 Indemnity Holdback Amount.

New York law governs "any disputes arising under [the APA] or related hereto (whether for breach of contract, tortious conduct or otherwise)."

Sections 2.8, 2.13, and 2.19 of the APA contain WTS' representations and warranties.

Section 2.8 is entitled "Compliance with Laws" and specifies:

> Since January 1, 2012, (i) the Business has been, and is currently, conducted in compliance with all applicable Law, (ii) each Seller has been, and is currently, in compliance with all applicable Law, and (iii) no Seller has received any written notice alleging any violation under any Law. No Seller is currently liable for the payment of any claims, damages, fines, penalties, or other amounts, however designated, for failure to comply with any Laws and, to the Knowledge of Sellers, no material expenditures are or will be required to remain in compliance with such Laws. To the Knowledge of Sellers, there is not any present or proposed requirement of any applicable Law that is due to be imposed on the Business or a Seller that is reasonably likely to increase the costs of complying with such Law or that would render illegal or restrict the operations of the Business or a Seller.

The APA defines "Knowledge of Sellers" as "the collective knowledge of Bob Jonas, Jamie Hartley, and Kayla Hartley, who will each be deemed to have 'Knowledge' of a particular fact or other matter if such individual is actually aware or ought reasonably to have been aware of such fact or other matter had such individual made all usual and reasonable inquiries and all inquiries which would have been reasonable in light of each individuals' position or knowledge." And "Law" is defined as "any provision of any federal, state, local, foreign, international, municipal or administrative order, constitution, law, common law and the law of equity, ordinance, license, permit, regulation, rule, Order, code, plan, statute or treaty of and the departmental or regulatory policies and guidelines of, a Governmental Entity."

Section 2.13, titled "Permits," states:

> Schedule 2.13 contains a true and correct list of all Permits held by a Seller. Sellers hold all Permits which are required for the ownership, lease, or operation of, or necessary for it to own, lease or operate, the Acquired Assets and conduct the Business. All such Permits are in full force and effect, and no Seller is in default (or with the giving of notice or lapse of time or both, would be in default) under any such Permits. There are no Legal Proceedings pending or, to the Knowledge of Sellers, threatened, that seek the revocation, cancellation, suspension, or adverse modification of a Permit held by a Seller. All required filings with respect to such Permits have been timely made and all required applications for renewal thereof have been timely filed. No consent, notice or other notification is required under

any Permit as a result of the Transactions and the effectiveness of the Permits will not be affected by the consummation of the Transactions.

"Permit" means "any permit, license, approval, Order, concession, clearance, registration, certificate, franchise, qualification, Consent or authorization issued by a Governmental Entity." Schedule 2.13 listed a number of business licenses, as well as a State of Oregon Construction Contractors Board license and two transportation carrier licenses.

Section 2.19 pertains to "Environmental Matters":

Sellers have been in the past and currently are, and the Business has been and continues to be conducted, in compliance in all material respects with all Environmental Laws. To the Knowledge of Sellers, no event has occurred or circumstances exists that (with or without notice of lapse of time) (a) would constitute or result in a material violation by a Seller of, or a failure on its part to comply with any Environmental Law, (b) would reasonably be expected to result in material Liability under any Environmental Law, or (c) would give rise to any material obligation on the part of the Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature; Sellers have obtained and maintain all Permits relating to or required under Environmental Laws to conduct the Business (the "Environmental Permits"). Sellers are and have been in material compliance with, and have timely made all reports, submissions, filings, or renewal applications required under, such Environmental Permits. A list of all Environmental Permits is set forth in Schedule 2.19.

The APA defines "Environmental Law" as "any Law which relates to or otherwise imposes Liability or standards of conduct relating to environmental, health or safety matters [including but not limited to] any Law governing the use, storage, disposal, cleanup, generation, treatment, transportation, or remediation of Hazardous Substances." WTS' most recent BES permit (which was non-transferrable) was the only permit disclosed under Schedule 2.19.

Section 6.1 sets forth the applicable statutes of limitations related to Sections 2.8, 2.13, and 2.19:

All of the representations and warranties of Buyer and Seller Parties set forth in this Agreement will survive the Closing and will terminate on the date that is 18 months after the Closing Date except . . . the representations and warranties set forth in . . . Section 2.19 [will] survive the Closing until 60 days following the expiration of the

Page 5 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

statute of limitation applicable to matters covered thereby (after giving effect to any waiver or extension thereof granted by the applicable party). Notwithstanding the preceding sentence, any representation or warranty in respect of which indemnity may be sought under this Agreement will survive the time at which it would otherwise terminate pursuant to the immediately preceding sentence if written notice of the inaccuracy or breach thereof giving rise to such right of indemnification has been given prior to such time.

Section 7.1 prescribes the requirements for providing written notice of a claim.: "All notices and communications hereunder will be deemed to have been duly given and served . . . by email" to the following address: earlybirdmom03@yahoo.com. A copy must be sent to counsel, but "will not constitute notice to [defendants]." Thus, any purported liability for the breach of Section 2.8 or 2.13 expired 18 months after January 6, 2017 – or on July 6, 2018 – unless notice was given in accordance with Section 7.1.

WTS agreed to indemnify NRC "from, against and in respect of any Losses" arising out of or relating to "any breach of any representation or warranty made by [or] nonfulfillment or breach of any covenant or agreement of a Seller Party contained" in the APA. "'Losses' means any and all claims, damages, deficiencies, fines, fees, losses, Liabilities, penalties, diminution in value, lost profits, Taxes, interest, payments (including those arising out of any Order or Legal Proceeding), and reasonable costs and expenses (including interest, court costs, reasonable fees of attorneys, accountants, and other experts or other expenses incurred in investigating, preparing, defending, avoiding, or settling any claim, default, or assessment)."

Finally, the APA provides the Indemnity Holdback Amount is payable by NRC "(o)n the first Business Day following the 18 month anniversary of the Closing Date" – i.e., July 7, 2018 – to the extent it "exceeds the sum of (i) the aggregate amount of indemnification claims validly made [and then pending] and (ii) the aggregate of all Finally Determined Losses." The "Indemnity Holdback Amount will be used to satisfy all Final Determined Losses for which a Buyer

Indemnified Party is entitled to indemnification hereunder, except that the obligations to so indemnify, defend and hold harmless will not be limited to the Indemnity Holdback Amount." "'Finally Determined Losses' means all Losses for which a 'final determination' has been made." A "final determination," in turn, exists when "the parties to the dispute have reached an agreement in writing" or "a court of competent jurisdiction will have entered a final Order."

Mr. Jonas and his wife retained ownership of the Clutter Facility following the APA. NRC leased the Clutter Facility from Mr. Jonas pursuant to a separate agreement ("Clutter Lease") with a five year term. WTS also coterminously assigned NRC its lease obligations related to the Killingsworth Facility ("Killingsworth Assignments").

*III. Proceedings Before This Court*

NRC initiated this action in July 2019, alleging the following claims: (1) breach of Sections 2.8, 2.13, and 2.19 of the APA; (2) negligent misrepresentation; and (3) mutual or unilateral mistake. NRC's third claim was subsequently withdrawn in light of the parties' partial settlement.

Defendants were ultimately granted summary judgment as to NRC's negligent misrepresentation claim, and breach of contract claims under Sections 2.8 and 2.13 of the APA as to the Clutter Facility. NRC, in turn, was granted summary judgment as to its breach of contract claim under Section 2.19 of the APA as to the Clutter Facility's wastewater pretreatment operations. *See generally NRC Env't Serv., Inc. v. Barnards Holdings, Inc.*, 2021 WL 2673781 (D. Or. Apr. 19, 2021), *adopted by* 2022 WL 444373 (D. Or. Feb. 14, 2022).

NRC is seeking $2,376,630 in damages related to its remaining claims, plus interest ($97,356 associated with the Clutter Facility's operations; $163,151 for the City of Portland Conditional Use Permit ("CUP"); $1,110,131 for future out-of-pocket expenses arising from

improvements to the Killingsworth Facility[1] required by the CUP; and $1,005,992 for lost street sweeping profits through 2024). Pl.'s Trial Mem. 22 (doc. 105).

Additionally, the parties each seek contractual attorney fees and costs. Finally, defendants assert a counterclaim for the APA's Indemnity Holdback Amount of $350,000 (plus 9% judicial interest from July 2018).

## FINDINGS OF FACT

*A. Considering the evidence presented and weighing credibility of the witnesses, the Court finds as follows as to the Killingsworth Facility:*

1. Title 17 of the Portland City Code ("PC") governs public improvements, including sanitary and storm water collection systems. BES is responsible for the application and enforcement of Title 17 and has authority to develop and require permits, authorizations, inspections, and other forms of review and approval.

2. Title 33 of the PC separately governs planning and zoning. The Portland Bureau of Development Services ("BDS") is responsible for the application and enforcement of Title 33, including land use approvals and permits related to the Portland Zoning Code, which applies to all land within the city.

3. The Killingsworth Facility is zoned General Industrial 2 under the Portland Zoning Code.

4. In August 2010, BES issued WTS an industrial wastewater discharge permit for a Centralized Waste Treatment Facility, which allowed WTS to discharge water that was pretreated

---

[1] As addressed below, Ms. Morones, NRC's damages expert, calculated future out-of-pocket expenses arising from improvements to the Killingsworth Facility at $1,003,955 based on averaging two September 2020 construction bids 2020 and then multiplying them by a present value factor of 0.90 (this corresponds to a discount rate of 10.6% premised on NRC's weighted average cost of capital, which is a measure of the expected return on investment for the company's cash flow using industry benchmarks and NRC's financial characteristics). The present value factor multiplier accounts for the difference between Ms. Morones' and NRC's figures.

at the Clutter Facility into the Portland sewer system via the Killingsworth Facility ("2010 Permit").

(Stipulated Fact #20)

    5. At some unspecified time after 2010, defendants began treating and discharging septage

and grease-trap wastewater at the Killingsworth Facility.

    6. In July 2011, BDS determined these operations violated Title 33 of the PC and advised

defendants to "[c]ease the waste-related use at this property" or obtain a CUP.

    7. In November 2011, BDS and BES conferred and instructed defendants that they could

continue disposal operations without obtaining a CUP as follows:

> [D]isposal of the excess storm water runoff which is typically pulled from catch
> basins, underground electrical or underground storm vaults, storm swales, oil/water
> separators, and leachate (typically storm water from the land fill/dump) is allowed
> without a Conditional Use Review and will not be viewed as a waste-related use if
> no treatment occurs on the site. The trigger for requiring a Conditional Use Review
> all depends on whether or not the material is receiving treatment at the site. If the
> treated stormwater is simply transported to this site and meets acceptable levels for
> disposal into the sanitary sewer system without further treatment, then no
> Conditional Use Review would be required and this would not be considered a
> Waste Related Use.
>
> If any of the wastewater creates additional residual waste, it will then be viewed as
> a Waste-Related Use and will require a Conditional Use Review.

(Stipulated Fact #25)

    8. Defendants initiated the process to obtain a CUP but ultimately determined that it was

too costly and instead elected to stop processing septage at the Killingsworth Facility, representing

to BDS that "[r]esidual waste will not be generated on site; separation will occur [at the Clutter]

facility." (Stipulated Facts #23-24)

    9. In February 2012, BDS inspected the Killingsworth Facility in response to an odor

complaint to confirm it was simply a "discharge point-of-compliance." (Stipulated Fact #26)

10. In March 2012, BES advised BDS "[a]ll of the processing equipment has been sold and removed from the property," and indicated that WTS "no longer produced any residual solid waste, and only use the site as a discharge point." (Stipulated Facts #27-28)

11. In October 2013, BDS issued a Notice of Zoning Violation to WTS in association with "[w]aste related activities on the site (NRC paint solids disposal) without the required Conductional Use Review for a waste-related use." This notice advised:

> Waste-related uses are characterized by uses that received solid or liquid wastes from others for disposal on the site or for transfer to another location, uses that collect sanitary wastes, or uses that manufacture or produce goods from the biological decomposition of organic material . . . Land Use Review records shows that there is no approved Conditional Use Review at this site.
>
> Previous determinations and information to you identified that as long as no treatment of liquids or solids was occurring at the site, the use would not fall into a waste-related use category. Based on that determination, you ceased all processing of septage to separate solid wastes. As long as no treatment occurs for the liquids introduced to the City's sanitary/storm system at this discharge point, this is not characterized as a waste related use.
>
> On August 2nd and 3rd, we received a report and subsequent evidence that NRC was cleaning out and disposing of liquids and solid wastes from their tanker truck. This included pumping out their truck into a drop box to allow the paint solids to settle and dry which then required disposal off-site at a landfill. This is considered processing of solid waste and therefore constitutes a waste-related use at this site.

12. WTS immediately ceased allowing NRC to dispose of paint solids at the Killingsworth Facility.

13. Also in October 2013, BDS confirmed that "WTS activities at this site are not a waste-related use, they are just disposing of their treated stormwater into the City's system at this site as allowed by their BES permit."

14. In December 2013, BDS reiterated "that the trigger for requiring a Conditional Use Review [at the Killingsworth Facility] all depends on whether or not the material is receiving treatment at the site" or "[i]f any of the wastewater creates additional residual waste."

Page 10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

15. In May 2014, BES inspected the Killingsworth Facility, during which it noted an oil/water separator as an added pretreatment system.

16. In May 2015, BES inspected the Killingsworth Facility, during which it observed the presence of "pH Adjustment" equipment and oil/water separators, which were "filled w[ith] floating oil [and] need[ed] to be pumped." BES instructed defendants that "[a]ll wastewater containing settleable solids must go through [the Clutter Facility] first."

17. In June 2015, BES renewed WTS' industrial wastewater discharge permit ("2015 Permit"), which allowed WTS to discharge waste streams from leachate or "generated in the cleaning of oil interceptors (catch basins, oil/water separators, vaults, etc.), where the solids have been removed through treatment"; any wastewater "delivered directly to the permittee's Portland facility from the generating source . . . shall not contain solids that can be screened out, or are readily settleable." (Stipulated Fact #21)

18. The 2015 Permit required WTS to "comply with all other applicable City, State and Federal regulations."

19. WTS' October 2015 "Waste Acceptance and Treatability Plan" for the Killingsworth Facility (which was furnished to NRC in December 2016) provided for pH adjustment treatments and the use of oil/water separators. (Stipulated Fact #41)

20. In November 2015, BES inspected the Killingsworth Facility, during which it documented the presence of pH adjustment systems, oil/water separators, and carbon filters.

21. On January 10, 2017, four days after the APA was executed, BES inspected the Killingsworth Facility to verify that all of WTS' activities had been terminated, and documented the presence of oil/water screens and pH processing chemicals. (Stipulated Facts #49-50)

22. Mr. Jonas acknowledged pH treatment and oil/water separation occurred at the Killingsworth Facility, and that NRC purchased equipment and chemicals related thereto pursuant to the APA. (Stipulated Facts #36-37, 42)

23. Mr. Jonas testified that WTS never notified BDS of the addition of this equipment.

24. Prior to the APA, Dr. Ransdell toured the Killingsworth Facility with Mr. Hartley on behalf of NRC, and observed oil-water separators and the PH system, but was otherwise unaware of any information or directives from BDS limiting the Killingsworth Facility's operations solely to the discharge of pretreated wastewater.

25. Dr. Ransdell testified that NRC used WTS' October 2015 "Waste Acceptance and Treatability Plan" in developing its own plan and in seeking its own BES permit.

26. When NRC assumed WTS' operations, Mr. Keesee and Dr. Ransdell both witnessed several inches of sludge at the bottom of the tanks at the Killingsworth Facility.

27. NRC cleaned the equipment at the Killingsworth Facility and disposed of the sludge left by defendants' operations.

28. Dr. Ransdell testified that it became clear early on that the Killingsworth Facility's existing equipment would not allow NRC to meet discharge requirements so NRC immediately began looking into new equipment.

29. On January 31, 2017, Dr. Ransdell sent an email to the City of Portland, posing certain inquiries "[a]s we start going through a redesign of the WTS system on Killingsworth."

30. In February 2017, a representative from ProAct sent Dr. Ransdell specifications for a 200 gmp water treatment system; Dr. Ransdell advised that putting the system indoors would be preferable due to a potential issue with the neighborhood association. (Stipulated Facts #52, 61)

31. In March 2017, Mr. Keesee circulated a proposal "to upgrade the wastewater treatment system at the former WTS water plant," explaining "[t]he City of Portland was in the process of requiring WTS to either shut down the system or upgrade it when we made the purchase of WTS. (They said this information would not be shared with NRC at that time as the transaction as not complete)."

32. In April 2017, NRC executed a contract with ProAct. (Stipulated Fact #53)

33. In May 2017, NRC obtained its own industrial wastewater discharge permit from BES for the Killingsworth Facility, which was subsequently revised and renewed ("2017 Permit"). (Stipulated Facts #22, 129-30)

34. The 2017 Permit approved one additional waste stream.

35. In August 2017, ProAct installed the water treatment system at the Killingsworth Facility, which additionally required widening the entry-way to accommodate a tank. (Stipulated Facts #54-55)

36. The new ProAct system included a COWS 250-Oil Water Separator, End Suction Centrifugal Transfer Pump, 2-Stage Bag Filter Systems, Clay/Zeolite Absorber, and Granular Activated Charcoal Absorber. (Stipulated Fact #56)

37. Dr. Ransdell and Mr. Keesee testified that these upgrades essentially duplicated WTS' operations but were necessary to replace the existing faulty or failing equipment.

38. NRC also purchased and installed additional tanks and a basket strainer at the Killingsworth Facility. (Stipulated Facts #57, 60)

39. In October 2017, NRC submitted an Early Assistance Application with BDS for a centralized wastewater treatment facility, at which point it learned that, in 2011, WTS had initiated, but never completed, the process to obtain a CUP.

40. In November 2017, NRC participated in a Pre-Application Conference with the City of Portland related to the Killingsworth Facility.

41. In December 2017, BDS and BES determined NRC needed a CUP and Development Review Permit, respectively, to operate the Killingsworth Facility. (Stipulated Fact #70)

42. Also in December 2017, a BDS correspondence reflected: "NRC is treating wastewater [at the Killingsworth Facility] via oil/water separators" and "this would differentiate the current operation from the 2011 [WTS] case, in which you stated there was no processing of wastes occurring."

43. NRC hired PBS Engineering and Environmental Inc. ("PBS") to ensure it complied with all permitting requirements. PBS provided civil engineering, planning/landscape architecture, geotechnical engineering, and surveying services required for a CUP, and also prepared NRC's CUP application.

44. NRC also hired A Acoustics, Corbin Consulting Engineers, Inc., and Livermore Architecture & Engineering to comply with the City of Portland's CUP application and review. These companies provided a sounds study, outdoor mitigation plan, and nuisance mitigation site plan, respectively.

45. On June 7, 2018, NRC sent a Notice of Claim in regard to the Killingsworth Facility via email to defendants' counsel and the earlybirdmom03@yahoo.com address.

46. In July 2018, BDS issued a notice to NRC's landlord that the Killingsworth Facility "is not in compliance with Portland's Zoning Code," which could be corrected by ceasing waste-related uses – i.e., "all treatment and disposal of wastewater" – or applying "for a Type III Conditional Use Review." (Stipulated Fact #68)

47. In March 2019, NRC submitted its Revised Type III Conditional Use Review application to the City of Portland. (Stipulated Fact #69)

48. In June 2019, the City of Portland approved NRC's application for a CUP related to the Killingsworth Facility.

49. Dr. Ransdell and Mr. Keesee testified that NRC negotiated an additional ten-year term for its third-party lease related to the Killingsworth Facility (set to commence upon the expiration of the current lease term on August 31, 2023) and was looking into purchasing the property in light of its unique characteristics.

50. NRC's out-of-pocket costs incurred for the CUP total $163,151.

51. Ms. Morones testified that NRC's future costs to comply with the CUP and complete all of the improvements discussed therein are $1,003,955.

52. Mr. Keesee testified that NRC has not yet completed the work required under the CUP because it is still soliciting bids, a process which was considerably slowed by the pandemic, NRC's other acquisitions, and this lawsuit.

*B. Considering the evidence presented and weighing credibility of the witnesses, the Court finds as follows as to the Clutter Facility's street sweeping operations:*

1. The Washington County Community Development Code ("CDC") governs land use in Washington County and sets standards and requirements for developing and using land within the unincorporated portion of Washington County.

2. The ODEQ is the chief environmental regulatory agency for the State of Oregon and regulates solid waste.

3. At the time the APA was executed, the Clutter Facility was zoned FD-20. (Stipulated Fact #18)

4. Prior to 2003, the Clutter Facility was zoned as a MAE District.

5. NRC acquired the street sweeping contracts with the cities of Woodburn, McMinnville, Hillsboro, Wilsonville, Gresham, and Tigard via the APA. (Stipulated Fact #82)

6. Prior to the APA, defendants brought street sweepings from, on average, eight trucks per day to the Clutter Facility, where they were unloaded onto a single pad, screened for recyclables and trash, reloaded into drop boxes, and transported to another location within one to three days.

7. Prior to the APA, defendants sometimes disposed of street sweepings at the Riverbend Landfill.

8. Prior to the APA, defendants tested the inorganic material screened from the street sweepings twice per year; if they met the standards for "clean fill," they were slated for re-use.

9. Leaf season in Oregon comprises a portion of the fall and winter months.

10. During leaf season, street sweeping materials consist primarily of leaves.

11. At all other times of the year, organics make up a small fraction of street sweepings. Mr. Rich estimated that leaves might only comprise 10% of the collected material.

12. In September 2013, ODEQ instructed Mr. Jonas that he could not take street sweepings (except during leaf season) to Dayton Ecology Composting because "it is outside the scope of the compost permit." In particular, ODEQ explained:

> street sweepings from cities who routinely collect the debris from streets and gutters and storm drains . . . is a solid waste and has no use in composting since it is mostly inorganic material (sand, gravel, dirt, litter . . .). This issue has come up over and over as far as street sweepers wanting to find some inexpensive way to dispose of a solid waste other than at the landfill.

ODEQ reiterated "this is not a new issue, and there is a history as to why this material is regulated," and asked Mr. Jonas to apply for a Beneficial Use Determination ("BUD") "[i]f you choose to continue to accept this material."

13. In February 2014, Mr. Jonas received an ODEQ notice related to Dayton Ecology Composting explicitly advising that street sweepings could not be held at an interim facility absent a BUD:

> On a previous inspection I noted that a pile of street sweepings was present on the site. WTS has contracts with various cities to conduct street sweeping. Approved feedstocks for composting can include leaves from street cleanup. It does NOT include dirt, gravel and other debris that is swept from catch basins, streets, or parking lots during times of the year when leaf cleanup is not occurring. This material is a regulated solid waste that requires proper disposal at a permitted landfill or other approved site. Street sweepings are known to contain petroleum hydrocarbons, metals, litter, and other pollutants. If the material is to be used for any other purpose, a [BUD] would need to be completed by DEQ. This would require submittal of a BUD application to DEQ that characterizes the material through sampling and/or other means and includes the proposed end use of the material. This information would then be evaluated by DEQ staff.

> I sent Bob several emails about street sweepings not being allowed at the site and also included this information in a previous inspection report.

> This material cannot be brought to this or any other site for stockpiling or use (including as a base for the composting area) without some sort of plan and approval from DEQ.

> During this inspection, the pile of sweepings remained on the site and Bob said that it had been screened to remove debris and was to be used between windrows to level the areas. This is a violation of solid waste rules as explained above. The material needs to be removed from the site and disposed of properly and no more material brought in without specific approval from DEQ.

ODEQ's report subsequently repeated that street sweepings "are not allowed to be used as a feedstock or for any other purpose on the site (including storage) without proper testing and a BUD issued by DEQ," and screening them to remove organics from inorganics is "a violation of the solid waste rules."

14. In April 2014, ODEQ issued a Warning Letter to Dayton Ecology Composting for violating Or. Admin. R. 340-093-0040(1) associated with the presence of street sweepings. Mr. Jonas was instructed to "[r]emove and properly dispose of the street sweepings identified at the site and ensure that no more of this material is brought to this site."

15. Mr. Jonas "agreed to have the street sweepings piles taken for proper disposal at the landfill and to not bring any more of this material to the site."

16. In May 2014, Mr. Jonas applied for and obtained a Waste Management profile at the Riverbend Landfill for WTS street sweeping disposal.

17. At least as of 2014, Jonas knew or reasonably should have known non-leaf season street sweepings, whether stowed temporarily at the Clutter Facility or otherwise, were regulated as solid waste and subject to ODEQ oversight if not disposed of at a landfill (and irrespective of where the organic and inorganic materials ended up after separation).

18. After 2014, defendants continued to temporarily store street sweepings containing organics and inorganics at the Clutter Facility, and directly transport those materials to Dayton Ecology Composting (and other unidentified facilities) for separation, composting, and/or reuse.[2]

19. ODEQ was unaware of WTS' trucking and street sweeping operations until May 2016 when it received an inquiry from Multnomah County concerning whether an ODEQ permit was required to temporarily stockpile street sweepings. Multnomah County included WTS as part of its inquiry because WTS "does the reuse." ODEQ asked Multnomah County to reach out to defendants to determine the confines of their operations and "if their facility needs a permit as well." Despite repeated requests for information, Mr. Jonas was completely unresponsive. ODEQ

---

[2] In May 2016, ODEQ ordered Dayton Ecology Composting to "immediately cease accepting all feedstock types," including leaves from street sweepings. ODEQ did not authorize Dayton Ecology Composting to resume operations until August 2017.

indicated that it would perform a site visit at WTS' "facility in the next few months" or sooner if possible, explaining "[u]nfortunately some of these companies fall through the cracks permit-wise."

20. In March 2016, ODEQ replied as follows to an inquiry from Ms. Glathar concerning another facility's street sweeping operations: "For at least the past 10 years, DEQ's position has been that facilities that aggregate street sweepings prior to disposal will require a transfer station permit. Unfortunately, we do not have the staffing to search out these facilities and request permits from facilities as they come to our attention."

21. In June 2016, the Washington County Department of Health and Human Services responded to an odor complaint relating to the Clutter Facility. At the site, Washington County "detected an odor of what smelled like anaerobic rotting yard debris" on a portion of the property leased to a third-party landscaping company. Washington County "advised [the] company [that it] could not bring waste materials . . . on to the property for composting without first obtaining permits from DEQ, METRO, and Washington County." It also separately informed Mr. Jonas that "composting as it was currently being done was not an allowed use of his property without first obtaining the appropriate permits." (Stipulated Facts #75-79)

22. The Washington County Department of Health and Human Services complaint was closed in July 2016 following a subsequent site visit at which no yard debris or odor was observed. (Stipulated Facts #80-81)

23. Also in July 2016, Metro inspected the Clutter Facility to determine whether "a solid waste facility license [was required for WTS] to operate a yard debris reload facility." The inspection form notes that, "[i]n addition to operating the yard debris reload, [WTS] provides street sweeping", and reflects Mr. Hartley's comment that defendants agglomerated street sweepings

from various municipalities at the Clutter Facility and then brought them to "Riverbend Landfill for disposal." WTS' yard debris activities were separately described.

24. Metro ultimately determined that the Clutter Facility "is located outside of the Metro jurisdictional boundary and therefore is not subject to Metro's facility authorization requirements."

25. In January 2017, Multnomah County notified ODEQ that NRC had bought WTS. ODEQ responded that it would "reach out to NRC" and clarified Multnomah County would not need an ODEQ permit to send inorganic fines "to a mine reclamation location" if the tested "street sweeping grit" levels "are below the clean fill levels . . . But we would still need to figure something out for the organics portion as that would not meet the definition for clean fill."

26. Later in January 2017, ODEQ received a copy of the June 2016 Washington County Department of Health and Human Services odor complaint and Metro investigation. ODEQ queried in response: "Is anyone aware of this company? . . .  Have we always had yard debris reloads on [solid waste transfer station] permits?"

27. In February 2017, ODEQ resolved that "we generally do not put yard debris only transfer states under permit . . . unless there is a problem with the facility or if they are transferring food waste or some other stinky material. However, given [the] enforcement history with Bob Jonas and his methods of operation have not been the best environmentally I would suggest someone investigate in person and determine if a permit is necessary."

28. In June 2018, ODEQ inspected the Clutter Facility to "follow up on an odor complaint as well as to determine if site activities required a DEQ solid waste permit." ODEQ "observed a large pile of street sweeping debris onsite. DEQ also observed several smaller piles. According to NRC personnel, the pile is separated into an organics fraction from the larger debris. The larger debris is sent to Hillsboro Landfill for disposal." (Stipulated Fact #88)

29. ODEQ informed NRC "that site activities would likely require a solid waste permit":

> These activities include the accumulation and separation of street sweeping debris as well as wastewater pretreatment. Wastewater pre-treatment activities that are covered under a separate wastewater treatment permit are not typically required to obtain a DEQ solid waste permit. However, the wastewater treatment activities conducted at this facility are not regulated under a wastewater pretreatment permit.

(Stipulated Facts #71-72)

30. In August 2018, ODEQ notified NRC that the Clutter Facility needed "a solid waste transfer station permit . . . The site operations that require a permit are the street sweeping collection and segregation and the wastewater treatment (since the activity is not regulated under a pre-treatment permit" to a Publicly Owned Treatment Works ("POTW"). (Stipulated Fact #75)

31. In September 2018, ODEQ informed NRC that "[s]treet sweepings are not considered clean fill" and "organics from street sweepings are not an approved compost feedstock" – i.e., they "would likely require a DEQ beneficial use determination or other approval," which was "unlikely [to be] granted" given the presence of "PAHs, pesticides, and other contaminants in street sweepings."

32. In November 2018, an internal ODEQ email indicates it had "told NRC that they need a solid waste permit for [the Clutter Facility] mostly because they accumulate street sweeping debris."

33. In December 2018, ODEQ issued a Warning Letter to NRC for violating Or. Admin. R. 340-093-0050(1), noting that, during the June 2018 inspection,

> DEQ observed a stockpile of street sweepings at the facility and a wastewater pre-treatment system that does not have a wastewater treatment permit [although the wastewater pre-treatment system was not operational during the site visit]. This constitutes an illegal disposal site [and] Class I solid waste violation.

ODEQ detailed the following corrective actions: (1) "NRC must immediately cease accepting street sweeping debris at this facility"; (2) "[b]y January 31, 2019, NRC must submit to DEQ an

operations plan detailing how the material will be stored in accordance with all regulatory requirements"; and (3) "[b]y May 12, 2019, NRC must remove all street sweeping debris from the facility."

34. At the end of 2018, the Riverbend Landfill closed, making landfill disposal more expensive. (Stipulated Fact #114)

35. Mr. Keesee testified that NRC developed two of its own landfills, at which in-house pricing would be available.

36. In May 2019, NRC entered into a Mutual Agreement and Final Order with Washington County, pursuant to which NRC agreed to pay $9,600 in association with the violations outlined in the December 2018 Warning Letter and "relocate [its] solid waste activities from the [Clutter] Facility to a new location that can be permitted by DEQ." (Stipulated Facts #119-126)

37. In December 2019, NRC advised ODEQ that it had "closed all existing contractual agreements" for street sweeping services. (Stipulated Fact #102)

38. In February 2020, NRC provided its Final Report of Operational Activities pursuant to the Mutual Agreement and Final Order, confirming that "[a]ll work related to the street sweeping operation ceased on December 18, 2019" and "there are no prohibited (i.e., non-putrescible, non-hazardous or hazardous) wastes located" at the Clutter Facility. (Stipulated Facts #107-10)

39. In March 2020, ODEQ notified NRC that it had complied with the terms of the Mutual Agreement and Final Order. (Stipulated Fact #128)

40. Dr. Ransdell and Ms. Skinner testified that NRC retained the services of a real estate agent and diligently searched for a replacement property where NRC could resume street sweeping operations.

41. After viewing multiple properties, NRC was unable to find a suitable location and permanently closed its street sweeping branch.

42. NRC continues to conduct some business activities at the Clutter Facility and elected to treat the Clutter Lease as having a six (as opposed to five) year term ending December 31, 2022.

43. NRC's street sweeping operations were profitable in 2017 but dropped in 2018 and, ultimately, had a net loss in 2019. (Stipulated Facts #111-13)

44. NRC incurred costs totaling $19,351 to retain counsel and defend against the ODEQ enforcement action, and $74,861 in increased disposal costs for street sweeping waste to timely comply with ODEQ's requirements.

45. NRC incurred $3,144 for land use planning services and a Pre-Application Conference associated with Washington County's zoning requirements.

46. Ms. Morones testified that NRC's lost street sweeping profits totaled $1,005,991. Ms. Morones adequately identified the information and explained the basis for her lost profit calculations. She similarly explained how she reached her conclusions and considered and eliminated other damages sources based on her knowledge and experience. Defendants did not proffer any contrary expert testimony or alternate damages figure, or meaningfully call into question Ms. Morones' assumptions and methodologies, which are generally accepted within the industry.

*C. Considering the evidence presented and weighing credibility of the witnesses, the Court finds as follows as to the Clutter Facility's wastewater pretreatment operations:*

1. The Court previously determined at summary judgment that, based on defendants' own characterization of WTS' wastewater pretreatment activities, the Clutter Facility qualified as a "Solid Waste Transfer Station" under the CDC. *NRC Env't Serv.*, 2021 WL 2673781 at *23.

2. Defendants did not apply for or obtain any permits or land use approvals from Washington County for their Clutter Facility operations. (Stipulated Facts #16-17)

3. Prior to the APA, BES inspected the Clutter Facility's pretreatment operations on approximately an annual basis.

4. The Clutter Facility is not mentioned in either the 2010 or 2015 Permits, and the only location identified is the address of the Killingsworth Facility.

5. Mr. Keesee testified that the Clutter Facility's pretreatment system was in "poor shape" and there were "no available replacement parts."

6. NRC determined it was more costly to truck the pretreated water into Portland for discharge from unincorporated Washington County than to treat the wastewater on-site at the Killingsworth Facility.

7. In March 2018, BES inquired whether the Clutter Facility was "under a different permit?" Dr. Ransdell responded: "No, not really. They are receiving some portion of the wastes, and separating out the liquids, but the only treatment we do happens at Killingsworth."

8. In June 2018, ODEQ inspected the Killingsworth Facility, denoting "NRC has a Centralized Waste Treatment permit with the City of Portland" and that "[a]ll wastewater storage and treatment activities are conducted onsite in a warehouse," including the screening to remove the larger solids from liquids. ODEQ indicated that "a DEQ solid waste transfer station permit" was not required for these activities.

9. ODEQ also inspected the Clutter Facility in June 2018 and described NRC's pretreatment activities as follows:

> The wastewater treatment process is conducted inside a building. The process was not running during the site visit. According to NRC, they are updating the process. Wastewater accepted [consists] of catch basin liquids and solids from cleaning and maintenance of stormwater components. Solids generated from the process are

disposed on at Hillsboro Landfill. Liquids are sent to NRC's facility on NE Killingsworth in Portland for additional treatment and discharge into the city of Portland's sewer system. This activity is not covered under a wastewater treatment permit.

(Stipulated Fact #74)

10. NRC never told ODEQ that the Clutter Facility's pretreatment operations were regulated by a POTW. (Stipulated Fact #73)

## CONCLUSIONS OF LAW

1. Under New York law, a contract is interpreted to give effect to the intent of the parties as expressed by its language, which "is a matter of law for the court to decide." *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (citations and internal quotations omitted). Where the parties' intent is "clearly and unambiguously set forth, effect must be given to the intent as indicated by the language used." *Int'l Klafter Co., Inc. v. Cont'l Cas. Co., Inc.*, 869 F.2d 96, 99 (2d Cir. 1989) (citation and internal quotations omitted). "A contract is unambiguous when the contractual language has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." *Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 69 (2d Cir. 2014).

2. To prevail on a breach of contract claim, a plaintiff must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994); *see also CBS Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d 496, 503-04, 553 N.E.2d 997, 1001 (1990) ("[t]he express warranty is as much a part of the contract as any other term . . . and the right to indemnification depends only on establishing that the warranty was breached").

3. "Contract provisions that provide that representations and warranties survive a closing." *In re Residential Cap., LLC*, 524 B.R. 563, 592 (Bankr. S.D.N.Y. 2015).

4. The APA is an enforceable contract between NRC and defendants.

5. NRC performed its obligations under the APA by paying the purchase price, less the $350,00 Indemnity Holdback Amount.

6. NRC provided timely notice of its Killingsworth Facility claims, thereby preserving its allegations of breach under Sections 2.8 and 2.13 of the APA past the 18-month survival period.

7. Mr. Jonas expressly warranted under Section 2.19 of the APA that: (1) WTS "has been and continues to be conducted, in compliance in all material respects with all Environmental Laws" and "ha[s] obtained and maintain[s] all Permits relating to or required under Environmental Laws to conduct the Business"; and (2) he and Mr. and Ms. Hartley had no knowledge of any "event [that] has occurred or circumstances that exist [that] (a) would constitute or result in a material violation by [WTS] of, or a failure on its part to comply with any Environmental Law, (b) would reasonably be expected to result in material Liability under any Environmental Law, or (c) would give rise to any material obligation on the part of [WTS] to undertake, or to bear all or any portion of the cost of, any remedial action of any nature."

8. City, county, and state land use and zoning laws fall within the ambit of Section 2.19, which unambiguously pertains to health, safety, and the environment.

9. Although NRC's activities subsequent to the execution of the APA may be relevant to causation and damages, the sole focus for determining breach is defendants' activities prior to and on the date of the APA.

10. The fact an operator does not subjectively believe it requires a permit is not an excuse for failure to comply with regulations applicable to those operations.

11. While enforcement occurs on a complaint basis, the applicable laws, and written correspondences of ODEQ, the City of Portland, and/or Washington County make clear that a company is required to obtain all requisite permits prior to commencing any regulated activity.

*A. The Court concludes as to the Killingsworth Facility:*

1. Pursuant to the PC, waste related uses are allowed in areas zoned General Industrial 2 if approved through the conditional use process. PC §§ 33.140.100, 33.815.010.

2. Both the PC and BES permits define "pretreatment" as "the reduction of the amount of pollutants, the elimination of pollutants, or the alteration of the nature of pollutant properties in wastewater in accordance with federal, state, and local laws, regulations and permits prior to or in lieu of discharging or otherwise introducing such pollutants into the City sewer system." PC § 17.34.020(S); *see also* Or. Admin. R. 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(19) (ODEQ defines "pretreatment" as "the waste treatment that might take place before discharging to a sewerage system including but not limited to pH adjustment, oil and grease removal, screening, and detoxification"); Or. Admin. R. 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(30) ("'Treatment' or 'Waste Treatment' means altering the quality of wastewater by physical, chemical, or biological means, or a combination of them, that reduces the tendency of the wastes to degrade water quality or other environmental conditions").

3. The BES permits define "solid waste" consistent with the PC and Oregon law as "[a]ny garbage, refuse, or sludge from a waste treatment plant, water supply treatment place, or air pollution control facility including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities." *See* PC § 17.102.020(LL) ("'Solid Waste' has the meaning given in ORS 459.005(24)").

4. Oil qualifies and is regulated as a "solid waste."

5. Mechanically separating oil from wastewater and adjusting PH qualifies as "pretreatment."

6. WTS' operations at the Killingsworth Facility, at least as of 2014-2015, included wastewater pretreatment and resulted in residual solid waste.

7. Based on BDS' directives and the PC, WTS's activities at the Killingsworth Facility required approval by the City of Portland through a conditional use review.

8. WTS never formally applied for or held a CUP.

9. NRC has established that WTS breached Sections 2.8, 2,13, and 2.19 of the APA as to the Killingsworth Facility.

7. NRC has established that WTS' breaches caused its damages associated with obtaining and complying with a CUP for the Killingsworth Facility.

8. NRC is awarded $1,167,106 as to this claim, plus interest.

*B. The Court concludes as to the Clutter Facility's street sweeping operations:*

1. Under Oregon law, "solid waste" is defined as

all useless or discarded putrescible and nonputrescible materials, including but not limited to garbage, rubbish, refuse, ashes, paper and cardboard, sewage sludge, septic tank, and cesspool pumpings or other sludge, useless or discarded commercial, industrial, demolition and construction materials, discarded or abandoned vehicles or parts thereof, discarded home and industrial appliances, manure, vegetable or animal solid and semisolid materials, dead animals, and infectious waste.

Or. Rev. Stat. § 459.005(24). It does not include "[m]aterials used for fertilizer or for other productive purposes or which are salvageable such as materials used on land in agricultural operations." *Id.*

2. The ODEQ regulates solid waste "disposal sites," which are defined as:

land and facilities used for the disposal, handling or transfer of or energy recovery, material recovery, and recycling from solid wastes, including but not limited to

> dumps, landfills, sludge lagoons, sludge treatment facilities, disposal sites for septic tank pumping or cesspool cleaning service, transfer stations, energy recovery facilities, incinerators for solid waste delivered by the public or by a collection service, composting plants and land and facilities previously used for solid waste disposal at a land disposal site[.]

OAR § 340-090-0010(11).

3. "'Transfer Station' means a fixed or mobile facility other than a collection vehicle where solid waste is taken from a smaller collection vehicle and placed in a larger transportation unit for transport to a final disposal location." Or. Admin. R. 40-093-0030(96). "Transfer stations" are "disposal sites." Or. Admin. R. 40-096-0040(1), 40-093-0050(2)(f).

4. An ODEQ permit is required to operate a "disposal site" unless its activities are limited to "[r]eceiving source separated materials for purposes of material recovery." Or. Rev. Stat. §§ 459.205, 459.245; Or. Admin. R. 40-093-0050(3)(d)(B). "'Material Recovery' means any process of obtaining from solid waste, by pre-segregation or otherwise, materials which still have useful physical or chemical properties and can be reused, recycled, or composted for some purpose." Or. Admin. R. 40-093-0030(64). And "'Source Separate' means that the person who last uses recyclable materials separates the recyclable material from solid waste." Or. Admin. R. 40-093-0030(93).

5. Operations involving solid waste and/or environmental waste are not specifically authorized in Washington County's FD-20 District and are therefore prohibited uses. CDC § 308.

6. Accordingly, for a street sweeping facility to be permittable under the FD-20 designation, it had to be lawfully established at the time of re-zoning. CDC §§ 308-2, 308-2.2, 430-127.2, 430-127.3, 430-129.

7. WTS' relevant operations were not confined to yard debris. Rather, WTS received mixed loads of organics, inorganics, and trash/recyclables from multiple generators for intermediate storage and trash/recyclable sorting prior to disposal and/or reuse at one or more other facilities.

8. Non-leaf season street sweepings that are commingled or aggregated in this manner qualify as "solid waste."

9. The agricultural use exclusion does not apply to the majority of the street sweepings managed at the Clutter Facility.

10. The existence of a potential beneficial use does not exempt solid waste from appropriate regulation. *See Tire Jockey Serv., Inc. v. Dep't of Env't Prot.*, 591 Pa. 73, 915 A.2d 1165, 1189 (2007) (in addressing whether an interim tire facility qualified for an exception under similar waste permitting rules, the court rejected the plaintiff's argument that used tires "are not waste because they *will be* recycled for use as a substitute for a commercial product or as an ingredient in an industrial process" and instead held that "the plain language of the exception to the definition of 'waste' provides that such material is not waste *when* recycled, not *before* the material is recycled") (internal brackets and quotations omitted; emphasis in original).

11. Separation of the organics from the inorganics, and subsequent disposal/reuse thereof, never occurred at the Clutter Facility, such that the source separation/material recovery exclusion is inapplicable.

12. Although the organics and inorganics may not constitute "solid waste" individually or once screened and separated from a larger pile (and, in the case of inorganics, tested), exceptions or exclusions are determined when the material is being placed into the ground or used beneficially. Thus, while the street sweepings were at the Clutter Facility, they did not qualify as clean fill or for the agricultural use exception.

13. At a minimum, a BUD was required for WTS to legally operate the Clutter Facility's street sweeping operations prior to and at the time of the APA based on ODEQ's directives and Oregon law.

14. Defendants also needed a permit to operate the Clutter Facility as a street sweeping facility when the area was zoned as a MAE District in order to have had the option of submitting a Type I Procedure review to continue those operations once the area was designated FD-20.

15. Defendants never applied for any Washington County or ODEQ permits, or a BUD.

16. NRC established WTS breached Section 2.19 of the APA as to the Clutter Facility's street sweeping activities.

17. NRC established that WTS' breach caused its lost profit damages associated with the closure of Clutter Facility's street sweeping operations.

18. NRC has also established that WTS' breach caused the Washington County land use and zoning damages.

19. NRC has not established that its damages emanating from the ODEQ's enforcement action were caused by WTS' breach. NRC changed operations at the Clutter Facility to the extent that it began stockpiling street sweepings, which was the subject of the ODEQ's enforcement action.

20. NRC is awarded $1,009,135 on this claim, plus interest.

*C. The Court concludes as to the Clutter Facility's wastewater pretreatment operations:*

1. As determined at summary judgment, WTS breached Section 2.19 of the APA as to the Clutter Facility's wastewater pretreatment activities.

2. Irrespective of whether WTS' wastewater pretreatment activities were licensed as a POTW[3] under the 2010/2015 Permits (such that they were not subject to ODEQ oversight), the Clutter Facility was not operating in compliance with Washington County's zoning and land use regulations.

3. NRC has not established that any additional damages were caused by WTS' breach.

4. The record reflects that NRC began transitioning its wastewater pretreatment operations away from the Clutter Facility sometime in 2018 and it does not seek any lost profits associated with these operations since they were successfully transitioned to the Killingsworth Facility.

5. All other claimed Clutter Facility damages have been addressed in relation NRC's claim surrounding WTS' street sweeping operations.

*D. The Court concludes as to the remaining claims:*

1. Defendants initially asserted additional counterclaims that were settled earlier in this litigation. As stated in the parties' stipulation, NRC owes defendants $22,328.24, inclusive of any and all claims for attorney fees, costs, and interest, but which may be offset against any money judgment NRC obtains.

2. Defendants are entitled to the $350,000 Indemnity Holdback Amount, to be offset against NRC's damages. Per the APA, the Indemnity Holdback Amount did not become due until the resolution of these proceedings and issuance of a corresponding final judgment.

3. NRC is entitled to attorney fees and costs pursuant to the APA in association with defendants' breaches.

---

[3] A POTW "includes any devices and systems, owned by a State or municipality, used in the collection, transportation, storage, treatment, recycling and reclamation of wastewater." PC § 17.34.020(R). Accordingly, POTWs are synonymous with municipal sewage systems that discharge wastewater directly into public water ways. *See, e.g.*, *Ark. Poultry Fed'n v. U.S. Env't Prot. Agency*, 852 F.2d 324, 326 (8th Cir. 1988); PC § 17.34.020(B)-(C), (O)-(Q).

IT IS SO ORDERED.

DATED this 12th day of December, 2022.


_____
/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge